IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA )
)
v. ) Criminal No. 16-110
) **UNDER SEAL**
SAMIRKUMAR J. SHAH ) (18 U.S.C. § 1347)

**INDICTMENT**

FILED
MAY 17 2016
CLERK U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

The grand jury charges that:

COUNT ONE

At all times material hereto:

1. The defendant, SAMIRKUMAR J. SHAH (hereinafter SHAH), was a resident of the Western District of Pennsylvania, duly licensed as a physician with a board certification in cardiology.

2. The defendant controlled and managed medical offices in the Western District of Pennsylvania in Kittanning, Brookville, Fox Chapel, White Oak, Johnstown, New Castle, Bridgeville, Penn Hills, Lawrenceville, Andover, and Wexford.

3. Medicare was a federal health insurance program administered by the Centers for Medicare and Medicaid Services (CMS), an agency of the U.S. Department of Health and Human Services. Medicare paid for the reasonable and necessary medical services for people aged 65 and older and some persons under 65 with certain illness and/or disabilities. Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b). Shah was an authorized Medicare

provider and was bound by the laws, rules, and regulations that govern the Medicare program.

4. Medicaid was a system of medical assistance for indigent individuals who are aged, blind, disabled, or members of families with dependent children. The program was funded by both the federal and state governments. Pennsylvania Medicaid, also known as Medical Assistance, was governed by the Commonwealth of Pennsylvania Department of Public Welfare. Medicaid is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b). Shah was an authorized Medicaid provider and was bound by the laws, rules, and regulations that govern the Medicaid program.

5. Highmark Blue Cross Blue Shield (hereinafter Highmark) was a duly licensed health insurance company doing business in the Commonwealth of Pennsylvania. Highmark provided Medicare insurance through several health insurance products including Security Blue. Highmark was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b). Shah was an authorized Highmark provider and was bound by the laws, rules, and regulations that govern Highmark providers.

6. UPMC was a duly licensed health insurance company doing business in the Commonwealth of Pennsylvania. UPMC provided Medicare insurance through health insurance products including UPMC For Life. UPMC was a "health care benefit

program," as defined by Title 18, United States Code, Section 24(b). Shah was an authorized UPMC provider and was bound by the laws, rules, and regulations that govern UPMC providers.

7. Gateway Insurance Company, Inc., (Gateway) was a duly licensed health insurance company doing business in the Commonwealth of Pennsylvania. Gateway provided health insurance for persons eligible for Medical Assistance or Medicaid. Gateway was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b). Shah was an authorized provider and was bound by the laws, rules, and regulations that govern Gateway providers.

8. Medicare, Medicaid, Highmark, UPMC and Gateway paid authorized providers for covered medical services provided to insured individuals so long as coverage requirements were met. Medical services were required to be reasonable and medically necessary for the diagnosis or treatment of an illness or injury and were required to meet all other applicable statutory and regulatory requirements.

9. Angina was defined as chest pain caused by reduced blood flow to the heart muscle, and was usually caused by exertion or excitement. The Canadian Cardiovascular Society (CCS) published classifications of angina, and these classifications were referred to and used by the Medicare Program and most other insurers. For example, Class III angina was defined as "angina with mild exertion from walking one to

two level blocks at a normal pace, or climbing one flight of stairs at a normal pace". Class IV angina was defined as "angina at any level of physical exertion". Class III and IV angina were also referred to as disabling angina.

10. External counter pulsation therapy (ECP) was a noninvasive outpatient treatment for Class III or IV angina. Each treatment lasted approximately one hour and was required to be done under the direct supervision of a physician. Direct supervision of a physician in the office setting meant that the physician was required to be present in the building and immediately available to furnish assistance and direction throughout the performance of the procedure.

11. ECP typically involved placing the patient on a treatment table where compressive air cuffs were wrapped around each leg; one at calf level, another slightly above the knee and the third on the thigh. The cuffs inflated and deflated in sequential order. Electrodes were placed on the skin of the chest and connected in a specific order to an electrocardiogram (EKG) machine that measured electrical activity all over the heart. The ECP machine and its attached computer also performed a procedure known as bilateral non-invasive physiologic studies of upper or lower extremity arteries during the ECP. The patient's blood pressure and pulse were constantly monitored.

12. ECP was intended to relieve symptoms of disabling angina through the increase of cardiac output and blood flow.

ECP was covered for up to 35 treatments by Medicare, Medicaid, Highmark, UPMC and Gateway so long as ECP treatment was performed under the supervision of a physician, the patient suffered from Class III or IV angina, and in the opinion of a cardiologist, the patient (1) had a condition that was inoperable, or the patient was at high risk of operative complications or postoperative failure; (2) the patient's coronary anatomy was not readily suited to such procedures; or, (3) the patient would be subjected to excessive risk due to other medical conditions.

13. Physicians billing for medical procedures such as ECP were required to describe medical procedures they performed by using a numerical system known as current Procedural Terminology (CPT) codes. The CPT codes consisted of five [5] digit numbers and/or letters for each procedure and were required information on claim forms sent to insurers for payment.

14. The CPT code for ECP was G0166 and was known as a bundled CPT code in that it included payment for procedures encompassed by the ECP treatment including CPT code 93040, commonly used for EKG procedures; CPT code 93922, commonly used for Doppler testing, bilateral non-invasive physiologic studies of upper or lower extremities; and CPT code 94760 for pulse oximetry.

15. Medicare required medical services providers such as physicians to make a reasonable effort to collect from patients

a 20% co-payment for medical services rendered.

16. Medicare, Medicaid, Highmark, UPMC and Gateway relied upon the good faith and honesty of physicians to truthfully and accurately state on each claim form all of the requested information including a truthful and accurate medical diagnosis code and a truthful and accurate CPT code.

THE SCHEME

17. From in and around January 2008, and continuing thereafter to in and around December 2014, in the Western District of Pennsylvania, and elsewhere, defendant SHAH, did knowingly and willfully execute and attempt to execute a scheme to defraud health care benefit programs, that is, Medicare, Medicaid, Highmark, UPMC and Gateway, in connection with the delivery of and payment for health care benefits, items, and services, which scheme to defraud was in substance as follows:

18. It was a part of the scheme that defendant SHAH instructed employees known to the grand jury to indicate a diagnosis code on medical records of patients receiving ECP treatments that each ECP patient suffered from disabling angina, when in truth and in fact, as the defendant well knew, many patients did not suffer from Class III or IV angina.

19. It was further part of the scheme that defendant SHAH caused billings for ECP treatments to be sent to Medicare, Medicaid, Highmark, UPMC and Gateway that represented that the patients suffered from Class III or IV angina, when in truth and

in fact, as the defendant well knew, many patients did not suffer from disabling angina.

20. It was further part of the scheme that defendant SHAH, well knowing that a physician must be present in the building during ECP treatments, instructed employees who were not physicians to conduct ECP treatments when no physician was present.

21. It was further part of the scheme that defendant SHAH caused billings to be sent to Medicare, Medicaid, Highmark, UPMC and Gateway for ECP treatments given to patients when no physician was present.

22. It was further part of the scheme that defendant SHAH caused advertisements to appear in local newspapers that promised free consultations and screening for ECP, stated that "ECP Therapy will make you feel so good you will think you found the Fountain of Youth!", and stated that "Dr. Shah Waives The Deductible & Co-Pays".

23. It was further part of the scheme that defendant SHAH instructed employees to obtain patients by various means and to approach other doctors to find new patients for ECP treatments.

24. It was further part of the scheme that defendant SHAH, in order to recruit as many insured persons as possible for ECP, represented to patients, employees and others that insurance would cover their ECP treatments without regard to whether or not a person had disabling angina and the other conditions

required for insurance coverage of ECP.

25. It was further part of the scheme that defendant SHAH, in order to recruit as many insured persons as possible for ECP, represented to patients, employees and others that ECP would, among other things, give them more energy, cure erectile dysfunction, help them to lose weight and give them more physical stamina without exercise.

26. It was further part of the scheme that defendant SHAH, without regard to whether or not a person had disabling angina and the other conditions required for insurance coverage of ECP, represented to patients, employees and others that ECP was covered by their insurance, and that ECP would not cost them anything.

27. It was further part of the scheme that defendant SHAH did not routinely make a reasonable effort to collect a 20% co-payment from ECP patients as required, and instructed employees to have ECP patients sign a form claiming that the patient suffered from financial hardship whether or not that was true.

28. It was further part of the scheme that defendant SHAH, knowing that CPT code G0166 was a bundled code, caused his billings to be unbundled by billing for G0166 and also billing separately for tests included in the G0166.

29. It was further part of the scheme that defendant SHAH caused fraudulent bills totaling in excess of approximately $2,500,000, to be sent to Medicare, Medicaid, Highmark, UPMC and

Gateway.

EXECUTION

30. From January 2008 and continuing thereafter to December 2014, in the Western District of Pennsylvania and elsewhere, defendant SHAH did execute and attempt to execute the aforesaid scheme by:

a. causing billings for ECP to be sent to Medicare, Medicaid, Highmark, UPMC and Gateway well knowing that ECP treatments were only covered by insurers if, among other requirements, the patients suffered from Class III or IV angina, and well knowing that patients did not suffer from disabling angina.

b. causing billings to be sent to Medicare, Medicaid, Highmark, UPMC and Gateway for ECP treatments well knowing that the ECP treatments were only covered by insurers if, among other requirements, the treatment was provided when a physician was present in the building, and well knowing that physicians were not present for treatment.

All in violation of Title 18, United States Code, Section 1347.

COUNT TWO

The grand jury charges that:

At all times material hereto:

31. Paragraphs 1 through 16 are incorporated herein as though fully set forth.

THE SCHEME

32. Paragraphs 17 through 29 are incorporated herein as though fully set forth.

EXECUTION

33. From January 2008 and continuing thereafter to December 2014, in the Western District of Pennsylvania and elsewhere, defendant SHAH did execute and attempt to execute the aforesaid scheme by:

a. causing unbundled billings for ECP, electrocardiographs, Doppler tests and pulse oximetries to be sent to Medicare, Medicaid, Highmark, UPMC and Gateway well knowing that CPT code G0166 was a bundled code that included payment for these tests.

All in violation of Title 18, United States Code, Section 1347.

CRIMINAL FORFEITURE ALLEGATION

(Health care fraud)

34. The United States hereby gives notice to the defendant charged in Counts One and Two that, upon his conviction of any such offense, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(7), which requires any person convicted of such offense(s) to forfeit any property, real and personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense(s), including but not limited to, the following:

MONEY JUDGMENT

35. A sum of money equal to at least approximately $500,000 in United States currency.

36. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of such defendant(s) up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(7) and 982(b)).

A True Bill,

Foreperson

DAVID J. HICKTON
United States Attorney
PA ID No. 34524